# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-00-00677-CR
## NO. 03-00-00759-CR
## NO. 03-00-00760-CR

---

**Bobby Joe Harper, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF HAYS COUNTY, 22ND JUDICIAL DISTRICT**
**NOS. CR-99-0005, CR-99-0003 & CR-99-0004**
**HONORABLE CHARLES R. RAMSAY, JUDGE PRESIDING**

---

In appellate cause number 03-00-00677-CR, appellant Bobby Joe Harper is appealing from a judgment in a cause in which a jury found him guilty of capital murder. *See* Tex. Pen. Code Ann. § 19.03(a)(2) (West 1994). Because the State did not seek the death penalty, the trial court sentenced appellant to life imprisonment. *See* Tex. Code Crim. Proc. Ann. art. 37.071, § 1 (West Supp. 2001). In appellate cause numbers 03-00-00759-CR and 03-00-00760-CR, appellant appeals from judgments in which he was convicted of aggravated robbery. *See* Tex. Pen. Code Ann. § 29.03(a)(2) (West 1994). Before his trial for capital murder, appellant waived jury trials and entered pleas of not guilty before the court to the charges of aggravated robbery. The trial court found appellant guilty in each case and assessed appellant's punishment at life imprisonment. Because appellant's points of error and briefs are virtually the same in all three appeals, they will be considered

together. Appellant complains of the admission in evidence of his videotaped confession, of the admission of extraneous offenses, and of the admission of hearsay evidence. We will affirm the judgments.

**Facts**

In early October 1998, San Marcos City police officers were investigating three aggravated robberies as well as a capital murder committed in the course of an aggravated robbery. The general description and the modus operandi of the masked robber was in each of these crimes very similar. In the armed robbery of a clerk at a Sac-N-Pak store, a security surveillance videotape was obtained. This videotape was shown to appellant's father, mother, and cousin, all of whom, after becoming visibly distressed, identified appellant as the person shown committing the robbery. Although appellant was wearing a mask, they recognized his voice and the manner in which he moved. Thereafter, the officers obtained a warrant to arrest appellant for that offense. The officers found appellant and, after a four-hour standoff, he was arrested and advised of his lawful rights.

Detectives Scott Johnson and Steve Peyton took appellant to a room to conduct a videotaped interview. When they started to interview appellant, the detectives again, for the second time, advised appellant of his rights. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 2 (West 1979); *Miranda v. Arizona*, 384 U.S. 436 (1966). Appellant confessed to committing the armed robbery at the Sac-N-Pak store on October 1, 1998 and to an armed robbery at a Conoco store two hours before the robbery at the Sac-N-Pak store. Appellant also confessed that on October 8, 1998, he committed a robbery at another Conoco store and that he shot the clerk who appeared to be reaching

2

for something. The clerk died as a result of that gunshot wound. Over objection, appellant's videotaped confession was admitted in evidence.

**Request for Lawyer**

In his first five points of error, appellant insists that his constitutional and statutory rights were violated because his confession was obtained after his request for an attorney was disregarded. *See* U.S. Const. amend. V, VI, and XIV; Tex. Const. art. 1, § 10; Tex. Code Crim. Proc. Ann. arts. 1.05 (West 1977), 38.22, § 2 (West 1979).

After appellant was advised of his rights, the detectives started to interview appellant; he soon admitted the aggravated robbery at the Sac-N-Pak store. As the detectives continued the interview, the following colloquy occurred:

DETECTIVE PEYTON:      It's not? Where is it?

MR. HARPER:      It's a toy gun. I gave it to my little brother.

DETECTIVE PEYTON:      Okay. Well, that's nice of you. Okay.

MR. HARPER:      I don't even want to talk unless I have me a lawyer and go through this shit. I don't have to go through this shit, right?

DETECTIVE PEYTON:      Well, the first thing that's going to happen is, you know, you're going to get your fingers stitched up.

MR. HARPER:      No. I don't want them stitched up.

Detective PEYTON:      Well, that's between you and the medics, okay? All right. The next thing that's going to happen is you're going to get woke up after while and you're going to go before the judge and the judge is going to see that you have warrants out for you for a long time, a year. The evading warrant was a year ago--a year and one

3

month ago that they issued that evading warrant for you, and the engaging in organized criminal activity was longer than that. And the judge is going to see that you've been on the run for a year, and then he's going to see that the judge issued--another judge issued a warrant for your arrest for aggravated robbery, a first degree felony that could put you in the penitentiary for the rest of your life.

What's really–what's really interesting is that you have a chance to get this off your chest, and I know it's eating you up. I know what happened last night is eating you up.

MR. HARPER:             I don't know what you're talking about.

DETECTIVE PEYTON:       When things go wrong.

DETECTIVE JOHNSON:      Bobby Joe, you made mention of an attorney.

MR. HARPER:             Huh?

DETECTIVE JOHNSON:      You made mention of an attorney.

MR. HARPER:             Yeah.

DETECTIVE JOHNSON:      We've got a good system here and I believe in it and we told you you had the right to request an attorney before and during any questioning. Are you telling us you want to terminate this interview and speak to an attorney or do you want us to continue to discuss this matter?

MR. HARPER:             Now?

DETECTIVE JOHNSON:      Yes.

MR. HARPER:             It's fine.

DETECTIVE JOHNSON:      What's fine?

MR. HARPER:             We can discuss this.

4

DETECTIVE JOHNSON:     All right.

After this colloquy, appellant confessed to the murder and the other robbery.  Appellant argues strenuously that he asked for counsel and that the officers should have ceased to question him after he said, "I don't even want to talk unless I have me a lawyer and go through this shit.  I don't have to go through this shit, right?"  The State disagrees.  We must decide whether appellant actually invoked his right to counsel before continuing with the interview.

The Sixth Amendment right to counsel attaches only at the initiation of adversary criminal proceedings; before proceedings are initiated, a suspect in a criminal investigation has no constitutional right to assistance of counsel.  *Davis v. United States*, 512 U.S. 452, 456-57 (1994) (citing *United States v. Gouveia*, 467 U.S. 180, 188 (1984)).  Nevertheless, the Supreme Court held in *Miranda*, 384 U.S. at 469-73 that a suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and that the police must explain this right to him before questioning begins.  The right to counsel established in *Miranda* was one of a series of safeguards mandated that were not in themselves rights protected by the constitution but were instead measures to insure that the Fifth Amendment right against compulsory self-incrimination was protected.  *Davis*, 512 U.S. at 457; *Michigan v. Tucker*, 417 U.S. 433, 443-44 (1974).  Law enforcement officers must immediately cease questioning a suspect who clearly asserts his right to have counsel present during custodial interrogation.  *Edwards v. Arizona*, 451 U.S. 477 (1981).

In *Davis*, the Supreme Court determined that Davis, who during custodial interrogation told officers, "Maybe I should talk to a lawyer" did not invoke his right to a lawyer.

5

*Davis*, 512 U.S. at 455. Because a thorough discussion of the law applicable to this case is found in

*Davis*, we quote a lengthy portion of that opinion:

> . . . Invocation of the *Miranda* right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *McNeil v Wisconsin*, 501 US, at 178, 115 L Ed 2d 158, 111 S Ct 2204. But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning. See *ibid.* ("[T]he *likelihood* that a suspect would wish counsel to be present is not the test for applicability of *Edwards"); Edwards v Arizona, supra*, at 485, 68 L Ed 2d 378, 101 S Ct 1880 (impermissible for authorities "to reinterrogate an accused in custody if he has *clearly asserted* his right to counsel") (emphasis added).

> Rather, the suspect must unambiguously request counsel. As we have observed, "a statement either is such an assertion of the right to counsel or it is not." *Smith v Illinois*, 469 US, at 97-98, 83 L Ed 2d 488, 105 S Ct 490 (brackets and internal quotation marks omitted). Although a suspect need not "speak with the discrimination of an Oxford don," *post*, at 476, 129 L Ed 2d , at 382 (Souter, J., concurring in judgment), he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect. See *Moran v Burbine*, 475 US 412, 433, n 4, 89 L Ed 2d 410, 106 S Ct 1135 (1986) ("[T]he interrogation must cease until an attorney is present *only* [i]f the individual states that he wants an attorney") (citations and internal quotation marks omitted).

> We decline petitioner's invitation to extend *Edwards* and require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney. See *Arizona v Roberson*, supra, at 688, 100 L Ed 2d 704, 108 S Ct 2093 (Kennedy, J., dissenting) ("[T]he rule of *Edwards* is our rule, not a constitutional command; and it is our obligation to justify its expansion"). The rationale underlying *Edwards* is that the police must respect a suspect's wishes regarding his right to have an attorney present during custodial interrogation. But when the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning "would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity," *Michigan v. Mosley*, 423 US 96, 102, 46 L Ed 2d 313, 96 S Ct 321 (1975), because it would needlessly prevent the police from questioning a suspect in the absence of counsel even if the suspect did not wish to have a lawyer present. Nothing in *Edwards* requires the provision of counsel to a suspect who consents to answer questions without the assistance of a lawyer. In *Miranda*

6

itself, we expressly rejected the suggestion "that each police station must have a 'station house lawyer' present at all times to advise prisoners," 384 US, at 474, 16 L Ed 2d 694, 86 S Ct 1602, and held instead that a suspect must be told of his right to have an attorney present and that he may not be questioned after invoking his right to counsel. We also noted that if a suspect is "indecisive in his request for counsel," the officers need not always cease questioning. See *id.*, at 485, 16 L Ed 2d 694, 86 S Ct 1602.

We recognize that requiring a clear assertion of the right to counsel might disadvantage some suspects who—because of fear, intimidation, lack of linguistic skills, or a variety of other reasons—will not clearly articulate their right to counsel although they actually want to have a lawyer present. But the primary protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves. "[F]ull comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process." *Moran v Burbine, supra*, at 427, 89 L Ed 2d 410, 106 S Ct 1135. A suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted. Although *Edwards* provides an additional protection—if a suspect subsequently requests an attorney, questioning must cease—it is one that must be affirmatively invoked by the suspect.

In considering how a suspect must invoke the right to counsel, we must consider the other side of the *Miranda* equation: the need for effective law enforcement. Although the courts ensure compliance with the *Miranda* requirements through the exclusionary rule, it is police officers who must actually decide whether or not they can question a suspect. The *Edwards* rule—questioning must cease if the suspect asks for a lawyer—provides a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information. But if we were to require questioning to cease if a suspect makes a statement that *might* be a request for an attorney, this clarity and ease of application would be lost. Police officers would be forced to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong. We therefore hold that, after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney.

Of course, when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney. That was the procedure followed by the NIS agents in this case. Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel. But we decline to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him.

7

*Davis*, 512 U.S. at 459-61, 129 Ed. 2d at 371-73.

The Texas cases decided both before and after *Davis* are in accord with *Davis. See* in particular *Dinkins v. State*, 894 S.W.2d 330, 350-51 (Tex. Crim. App. 1995); *also Dowthitt v. State*, 931 S.W.2d 244, 257 (Tex. Crim. App. 1996); *Muniz v. State*, 851 S.W.2d 238, 251-53 (Tex. Crim. App. 1993); *Robinson v. State*, 851 S.W.2d 216, 232-34 (Tex. Crim. App. 1991).

After twice being advised of his right to counsel, appellant confessed to the robbery at the Sac-N-Pak store. Then, appellant said: "I don't even want to talk unless I have me a lawyer and go through this shit. I don't have to go through this shit, right?" On the hearing of appellant's motion to suppress the confession and at trial, the officers testified that they did not hear and did not understand appellant's statement to be a request that he be furnished a lawyer before continuing the interview. In the context of the colloquy, it appears the officers reasonably construed appellant's statement to be a request for an explanation of the procedure to follow—"I don't have to go through this shit, right?" Immediately after appellant said this, the officers proceeded to answer his question about what he was going to go through. They explained he was going to be taken before a judge who would consider the outstanding warrants against him, and the officers told appellant that he could be imprisoned for life for the aggravated robbery to which he had confessed. In the ensuing exchange, appellant was asked to clarify what he wanted to do. Did he want to terminate the interview and speak to an attorney or did he want "to continue to discuss the matter." Appellant clearly expressed his desire to continue the interview.

Following the pretrial hearing of appellant's motion to suppress his confession, the trial court filed complete written findings of fact and conclusions of law that include the following findings:

8

(3)     THE COURT FINDS that the Defendant, Bobby Joe Harper, was Mirandized and advised of his legal and constitutional rights a second time after he had been "booked into the jail" and immediately prior to commencement of the interview;

(4)     THE COURT FINDS that after having been Mirandized on 2 separate occasions, that the Defendant, Bobby Joe Harper, did understand his legal and constitutional rights and furthermore, the Defendant, Bobby Joe Harper, indicated and acknowledged his understanding of his legal rights to the investigating officers;

(5)     THE COURT FINDS that with full understanding of his legal and constitutional rights, that the Defendant knowingly, intelligently and voluntarily waived his legal rights and agreed to proceed with the interview. The Court makes this finding after a review of "the totality of the circumstances" which includes a review of the actions and the conduct of the Defendant as well as taking into consideration the background and experience of the Defendant. The Court specifically cites to the Defendant's "extensive history with the criminal justice system" wherein:

≫     the evidence establishes that the Defendant has been "educated" about his legal rights as a result of having been repeatedly Mirandized as a consequence of repeated arrests; and

≫     the evidence establishes that the Defendant has been "educated" about his legal rights as a result of "exercising" those legal rights in connection with formal juvenile criminal proceedings wherein he has obtained the legal services of an attorney;

(6)     THE COURT FINDS that during the course of the interview, the Defendant, Bobby Joe Harper, did raise the subject matter of "a lawyer." However, the Court further finds that after "raising the subject matter of a lawyer," the Defendant specifically re-initiated contact and communication with the investigators by directing an inquiry to them relevant to "what was going to happen to him" and "to what extent he would have to participate."

(7)     THE COURT FINDS after explaining to the Defendant the sequence of events that were going to immediately transpire, that Det. Scott Johnson "scrupulously honored" the defendant's legal rights by seeking to "clarify" the Defendant's intentions when he specifically asked the Defendant ". . . whether or not he wanted to terminate the interview and to obtain the assistance of an attorney" or ". . . whether or not he wanted to continue the interview."

9

(8)     THE COURT FINDS that the Defendant knowingly, intelligently and voluntarily waived his legal and constitutional rights to assistance of counsel and to terminate the interview when in response to Det. Scott Johnson's inquiry, the Defendant answered that he was "willing to continue to discuss the cases."

Moreover, before the jury, appellant raised the issue of whether he requested counsel during the videotaped interview. Therefore, the trial court carefully instructed the jury on the law applicable to that issue and then the court charged:

Now, therefore, if you find from the evidence, or if you have a reasonable doubt thereof, that at the time of the making of the statement, if any, to Steve Peyton, the Defendant legally invoked his right to counsel by communicating to the police a desire to speak to an attorney or have an attorney present during an interview, then you will completely disregard such statement as evidence for any purpose nor will you consider any evidence obtained as a result thereof unless you find beyond a reasonable doubt that the Defendant initiated further discussion after indicating his desire to speak to an attorney.

Because it was necessary for the jury to give credit to appellant's confession to rationally find that he committed the murder, implicit in the jury's verdict is a finding that appellant did not clearly and unambiguously voice his right to counsel during the interview.

The evidence supports the trial court's findings and the implied finding of the jury that appellant did not unambiguously and unequivocally request counsel before continuing with the videotaped confession. We have viewed the videotape and considered all of the evidence to make our independent judgment. *See Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We conclude that appellant's request for counsel was ambiguous and equivocal and that appellant did not exercise his right to counsel during the course of his videotaped interview, in which he confessed to capital murder. Appellant's first five points of error are overruled.

**Confession Voluntary**

10

In points of error six through ten, appellant urges that his videotaped confession was erroneously admitted in evidence because it was not a voluntary confession. Appellant contends that his federal and state constitutional rights and his statutory rights were violated. *See* U.S. Const. amend. V, VI, and XIV; Tex. Const. art. 1, § 10; Tex. Code Crim. Proc. Ann. arts. 1.05 (West 1977), 38.22, § 2 (West 1979).

After hearing appellant's motion to suppress the confession, the trial judge made these additional written findings of fact:

(9)  THE COURT FINDS that the Defendant was not threatened or otherwise coerced into making his statement;

(10)  THE COURT FINDS that there were no promises made or other improper inducements communicated to the Defendant in exchange for or otherwise made to the Defendant in order to obtain his statement;

(11)  THE COURT FINDS that the videotaped statement obtained from the Defendant on 10 October 1998, wherein he admits his involvement in two (2) Aggravated Robberies as well as committing the Capital Murder during the course of a third Aggravated Robbery were knowingly, intelligently and voluntarily made by the Defendant and are admissible into evidence because they are fully in compliance with the requirements of Article 38.22, Texas Code of Criminal Procedure.

Appellant also raised the issue of the voluntariness of his confession before the jury, and the trial court carefully instructed the jury on the law applicable to that issue; then the court charged:

Now therefore, if you find from the evidence, or if you have a reasonable doubt thereof, that at the time of the making of the statement, if any, that the said Defendant was induced by unlawful compulsion or persuasion to make said statement, if any, then you will completely disregard such statement as evidence for any purpose, nor will you consider any evidence obtained therefrom as a result thereof.

11

Because it was necessary for the jury to give credit to the appellant's confession to rationally find that appellant committed the charged offense of capital murder, implicit in the jury's verdict is a finding that appellant was not induced by unlawful compulsion or persuasion to make the confession.

On appeal, appellant argues that his confession was involuntary because "it was the result of coercion and improper promises." Appellant bases his claim of coercion on the following evidence. Soon after appellant stated it would be "fine" to continue his interview, Detective Johnson raised his voice and said: "Bobby Joe I've been awake for a long time . . . . I'm getting real tired and I'm getting real shaky and I'm getting real pissed off for you to sit there all cocky and lie to us like that." Detective Johnson then angrily left the room. Detective Peyton continued to interview appellant but was soon called out of the room leaving appellant alone. When Detective Peyton returned, he told appellant that Detective Johnson was quite upset. Appellant agreed that Johnson had upset him and that they did not have a good relationship. On the other hand, appellant agreed that he and Peyton had a good relationship. Peyton told appellant that, if they could continue to talk, Johnson would not come back into the room; appellant agreed. Appellant says that Peyton's statements combined with Johnson's previous statements were coercive and therefore rendered his confession involuntary. The tactics used by the detectives cannot be characterized as abusive and coercive. These tactics are well within the bounds of propriety for officers taking a confession. *See Lane v. State*, 933 S.W.2d 504, 513 (Tex. Crim. App. 1996); *Garcia v. State*, 919 S.W.2d 370, 388 (Tex. Crim. App. 1996).

In addition, appellant contends that Detective Peyton made improper promises to him. The basis for this claim is that Detective Peyton told him, "Let me tell you something about the real world. If you are a crook and you try to lie your way out of everything, then district attorneys and

12

juries will put you away for the rest of your life. But if you're a stand-up guy [and tell the truth] and you want to take care of your business, then juries respect that." In response to Peyton's questions, appellant said several times that he was a "stand-up guy." For a promise to render a confession involuntary, it must be (1) positive, (2) made or sanctioned by someone in authority, and (3) of such an influential nature that it would cause an accused to speak untruthfully. *See Henderson v. State*, 962 S.W.2d 544, 564 (Tex. Crim. App. 1997); *Muniz v. State*, 851 S.W.2d 238, 254 (Tex. Crim. App. 1993). We do not construe Peyton's common-sense statement of the benefit of being a "stand-up guy" to be a positive promise of such an influential nature that it would cause appellant to speak untruthfully.

Appellant also complains that Peyton coerced him to make the confession by touching and hugging him and praying with him, asking God to forgive and help him. Although Peyton gently touched appellant when he was confessing, it was not until after appellant confessed to the murder that Peyton placed his arm around appellant's shoulders and prayed for appellant and the family of the victim whom appellant had killed. Peyton's prayer and his concern shown for appellant and the victim's family after appellant had confessed did not induce the confession.

The evidence supports the trial court's findings and the jury's implied finding that appellant's confession was voluntary. We have viewed the videotape and considered all of the evidence. In compliance with *Guzman v. State*, 955 S.W.2d 85 (Tex. Crim. App. 1997), we have independently determined that appellant's confession was voluntary. Appellant's points of error six through ten are overruled.

**Extraneous Offenses**

13

In his eleventh point of error, appellant complains that the trial court "erred in allowing extraneous offense evidence of various robberies allegedly committed by appellant." Through the testimony of Detective Johnson, the State offered evidence that within the two-week period before the commission of the capital murder offense, appellant committed three very similar aggravated robberies at convenience stores. Appellant argues that: "The only conceivable purpose of the extraneous offense evidence was to show that appellant was a criminal in general, to prove appellant's character, and to show that he acted in conformity therewith." Appellant insists that the admission of this evidence violated Rule 404(b). *See* Tex. R. Evid. 404(b). In addition, appellant contends that, even if relevant, evidence of the extraneous offenses should have been excluded because the probative value of this evidence was substantially outweighed by the danger of its unfair prejudice. *See* Tex. R. Evid. 403.

Evidence of the extraneous offenses was admitted by the trial court after the State argued:

> [I]t is highly probative on the issue of identity, it is highly probative on the issue of common course, scheme, and design . . . particularly where, in this case, we have no eyewitness who can identify him, we have a perpetrator who is concealing his identity through the use of a mask, we have no physical evidence, no finger prints . . . . And all we have is a confession which he [appellant] is trying to tell this jury is legally inadmissible, they should not consider [it] . . . . [A]t a prior hearing he has recanted and challenged the truthfulness and accuracy of that confession."

The trial court overruled appellant's objection to the testimony of Detective Johnson, and also found that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.

14

We conclude the trial court's rulings were within the "zone of reasonable disagreement" and must, therefore, be upheld. *See Montgomery v. State*, 810 S.W.2d 372, 387 (Tex. Crim. App. 1990). Further analysis of the issues that appellant attempts to present is unnecessary because the same evidence of which he complains was otherwise admitted in evidence without objection. The videotaped confession and the written transcription of the audio portion of that tape were admitted in evidence as separate exhibits. Although appellant had been granted a running objection to the admission of these exhibits on grounds that the confession was involuntary and made after appellant requested a lawyer, appellant has not designated where in the record he made an objection to these exhibits on grounds that they included evidence of the extraneous offenses; we have been unable to find such an objection. "Our rule, therefore, is that overruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained of ruling." *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998). Appellant's point of error eleven is overruled.

In points of error twelve through fourteen, appellant complains that the trial court "erred when it overruled appellant's objection to Officer Johnson testifying about various alleged extraneous offenses." Appellant's complaint here is based on Detective Johnson's testimony concerning the three extraneous aggravated robbery cases. Appellant repeatedly objected to this testimony on the ground that it was hearsay. Appellant argues that the State makes the untenable contention that this hearsay evidence was admissible as an exception to the hearsay rule, because it was not offered to prove the truth of the matter. While we agree that the State's unorthodox manner of proving the extraneous offenses through the hearsay testimony of Detective Johnson, rather than through the testimony of the victims of those offenses, may constitute error, it is not reversible error.

15

Here again, the same evidence was contained in the videotaped confession and in the written transcription of the audio portion of the tape that were admitted in evidence without an extraneous offense objection. No error is shown. *See Leday*, 983 S.W.2d at 718; *Webber v. State*, 21 S.W.3d 726, 730 (Tex. App.—Austin 2000, pet. ref'd). Points of error twelve through fourteen are overruled.

The judgments are affirmed.

_____

Carl E. F. Dally, Justice

Before Justices Kidd, Puryear and Dally[*]

Affirmed on All Causes

Filed: November 8, 2001

Do Not Publish

---

[*]   Before Carl E. F. Dally, Judge (retired), Court of Criminal Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).